UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANGEL GONZALEZ, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:17cv1402(MPS) |
| v. | : | |
| | : | |
| CORRECTIONAL MANAGED | : | |
| HEALTH CARE, ET AL., | : | |
| Defendants. | : | |

## **RULING AND ORDER**

The plaintiff, Angel Gonzalez, is currently incarcerated at MacDougall-Walker

Correctional Institution. He initiated this action by filing a civil rights complaint against

fourteen State of Connecticut Department of Correction medical staff members. On January 12,

2018, the court granted the plaintiff leave to file an amended complaint, dismissed the amended

complaint without prejudice for failure to comply with Rules 8 and 20 of the Federal Rules of

Civil Procedure, and directed the clerk to enter judgment for the defendants and close the case.

*See* IRO, ECF No. 17 at 10-11. The court informed the plaintiff that he could move to reopen

the case if he sought to file a second amended complaint that complied with Rules 8 and 20, Fed.

R. Civ. P. and included only one of the five claims or sets of claims identified by the court in its

order. *See id.* On January 16, 2018, the Clerk entered judgment for the defendants.

On January 19, 2018, the plaintiff filed a motion to reopen and to file a second amended

complaint, but on January 31, 2018, moved to withdraw the motion. On February 7, 2018, the

plaintiff filed a second motion to reopen the case and to file second amended complaint. On

May 1, 2018, the court granted the motion to withdraw the first motion to reopen and denied the

second motion to reopen and motion to file a second amended complaint without prejudice. See

Order, ECF No. 24.  The court concluded that the proposed second amended complaint did not comply with its order dismissing the complaint or Rules 8 or 20 of the Federal Rules of Civil Procedure.  The court permitted the plaintiff one more opportunity to file a second amended complaint that met the pleading and joinder requirements of the Federal Rules of Civil Procedure and its order dismissing the complaint.

Pending before the court is the plaintiff's third motion to reopen and to file a second amended complaint and the plaintiff's motion to amend the proposed second amended complaint attached to the third motion to reopen.   For the reasons set forth below, the motion to amend the proposed second amended complaint is denied and the third motion to reopen and to file a second amended complaint will be granted.

## I.       Motion to Reopen and to File a Second Amended Complaint [ECF No. 27]

The plaintiff seeks to reopen the case and to file a second amended complaint to comply with the court's initial review order, which dismissed the complaint without prejudice, and the court's orders denying his second motion to reopen.  The plaintiff contends that the proposed second amended complaint attached to the motion to reopen asserts only one claim or set of claims in compliance with the court's orders and the Federal Rules of Civil Procedure governing joinder.

A review of the proposed second amended complaint reflects that the plaintiff has chosen to pursue his claims of improper treatment or lack of treatment at Cheshire for symptoms related to a surgical procedure he underwent in 2009.  *See* Proposed Second Am. Compl., ECF No. 27-1 at 3-20.   Because the proposed amended complaint seeks to pursue only one set of claims related

to the plaintiff's medical treatment at Cheshire from 2012 to 2017, it satisfies Rule 20 of the Federal Rules of Civil Procedure.

The motion to reopen and to file a second amended complaint is granted to the extent that it seeks to reopen the case and to the extent that it seeks to file a second amended complaint to pursue only the claims against Dr. Ruiz, Nurse Ventrella, Nurse Jane Doe, Nurse John Doe, and Director Maurer regarding medical treatment or lack of medical treatment during his confinement at Cheshire from late 2012 to May 31, 2017.  The Clerk is directed to docket pages 3 to 45 of the motion file a second amended complaint, [ECF No. 27], as the Second Amended Complaint.

## II.    Motion to Amend the Motion to Reopen [ECF No. 28]

The plaintiff seeks to revise the request for punitive damages included in the Second Amended Complaint.  Specifically, the plaintiff seeks to add a request for punitive damages against the defendants in their official capacities.  A request for monetary damages against a defendant in his or her official capacity is barred by the Eleventh Amendment.  *See Kentucky v. Graham*, 473 U.S. 159 (1985) (Eleventh Amendment, which protects the state from suits for monetary relief, also protects state officials sued for damages in their official capacity); *Quern v. Jordan*, 440 U.S. 332, 342 (1979) (Section 1983 does not override a state's Eleventh Amendment immunity).  Thus, it would be futile to permit the plaintiff to amend his prayer for relief to include a request for punitive damages against the defendants in their official capacities.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (a district court need not grant leave to amend when amendment would be "futile").  Accordingly, the motion to amend, the prayer for relief in the Second Amended Complaint, is denied.

### III.     Second Amended Complaint

As indicated above, the Second Amended Complaint names Dr. Ricardo Ruiz, Nurse Jane Ventrella, Nurse Jane Doe, Nurse John Doe, and Director of Health Services Kathleen Maurer as defendants.   In addition to punitive and compensatory damages, the plaintiff also seeks injunctive and declaratory relief.

### A.     Standard of Review

Pursuant to 28 U.S.C. § 1915A(b), the court must review prisoner civil complaints against governmental actors and "dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief."  *Id.*  Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

Although detailed allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).   A complaint that includes only "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement,'" does not meet the facial plausibility standard.  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).  Although courts still have an obligation to interpret "a *pro se* complaint liberally," the complaint

must still include sufficient factual allegations to meet the standard of facial plausibility. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations omitted).

**B.      Facts**

On August 4, 2009 at Corrigan Correctional Institution, the plaintiff sustained an injury to his face while playing basketball in the recreation yard. *See* Second Am. Compl. at 7 ¶ 1. On August 14, 2009, the plaintiff underwent surgery at University of Connecticut Health Center ("UCONN") to repair the injuries to his face. *See id.* ¶ 2.

Approximately nine months to a year after his surgery, the plaintiff began to experience painful tingling, itching, and burning sensations all over his head, face, neck, and upper chest. *See id.* ¶ 3. The sensations caused the plaintiff to scream in pain and to experience paranoia, anxiety, and panic attacks. *See id.* ¶ 4.

On or about March 10, 2011, prison officials transferred the plaintiff to Cheshire Correctional Institution ("Cheshire"). *See id.* ¶ 5. At some point in 2012, the plaintiff submitted a request to be seen at sick call for the painful tingling, itching, and burning sensations that he continued to experience all over his head, face, neck, and upper chest. *See id.* ¶ 5.

Two weeks after a Cheshire medical provider examined him, Dr. Ruiz evaluated the plaintiff's symptoms. *See id.* ¶ 7. Dr. Ruiz determined that the plaintiff's symptoms were caused by his exposure to the shower water at Cheshire and prescribed an anti-fungal ointment, clotrimazole, to treat the symptoms. *See id.* at 8 ¶¶ 9-10.

At the end of 2012, the plaintiff requested to be seen by Dr. Ruiz regarding the painful tingling, itching, and burning sensations that he continued to experience all over his head, face, neck, and upper chest. *See id.* ¶ 12. In January 2013, Dr. Ruiz examined the plaintiff in

response to his complaint that the clotrimazole ointment had not alleviated his symptoms. *See id.* ¶¶ 13-14. Dr. Ruiz prescribed a different ointment, triamcinolone acetonide, to treat the plaintiff's symptoms. *See id.* ¶ 15.

A few months later, the plaintiff requested to be seen by Dr. Ruiz because the triamcinolone acetonide ointment was not alleviating his symptoms. *See id.* at 9 ¶ 16. A month after submitting his request for treatment, Dr. Ruiz re-evaluated the plaintiff's symptoms. *See id.* ¶ 17. During the appointment, the plaintiff requested that Dr. Ruiz prescribe Lubriderm lotion for his skin and that he refer him to be evaluated by a dermatologist or a neurologist. *See id.* ¶ 18. Dr. Ruiz prescribed an oral medication, loratadine, to treat the plaintiff's symptoms. *See id.* ¶ 19.

Approximately nine months later, at some point in 2014, the plaintiff requested to be seen by Dr. Ruiz regarding the painful tingling, itching, and burning sensations that he continued to experience all over his head, face, neck, and upper chest. *See id.* ¶ 20. Within two weeks of the date that the plaintiff submitted his request for treatment, Dr. Ruiz re-evaluated his symptoms. *See id.* ¶ 22. During the appointment, the plaintiff informed Dr. Ruiz that the prescription for loratadine had not alleviated his symptoms. *See id.* The plaintiff also questioned Dr. Ruiz regarding the cause of his symptoms. *See id.* at 10 ¶ 25. Dr. Ruiz stated that could not describe or definitively diagnose the cause of the plaintiff's symptoms. *See id.* ¶ 26. The plaintiff requested that Dr. Ruiz refer him to a dermatologist or a neurologist. *See id.* ¶ 27. Instead of treating the plaintiff's painful and itchy skin condition, Dr. Ruiz referred the plaintiff for a blood test to assess the condition of his liver. *See id.* ¶ 28.

At the end of 2014, the plaintiff requested to be seen by Dr. Ruiz regarding the painful tingling, itching, and burning sensations that he continued to experience all over his head, face, neck, and upper chest. *See id.* ¶ 29. In February 2015, during an appointment with Dr. Ruiz, the plaintiff gave Dr. Ruiz a letter. In the letter, the plaintiff indicated that the ointments and oral medication that Dr. Ruiz had prescribed to treat his symptoms had been ineffective. *See id.* at 10-11 ¶¶ 31-32. The plaintiff then informed Dr. Ruiz that he believed that his symptoms were caused by a neurological disorder and requested that Dr. Ruiz treat his symptoms with an oral medication called gabapentin, also known by its brand or trade name, Neurontin.[1] *See id.* at 11 ¶¶ 32-33. Dr. Ruiz agreed to the request and prescribed Neurontin to treat the plaintiff's symptoms. *See id.* ¶ 34.

At some point in May 2015, the plaintiff submitted a written request to be seen by Dr. Ruiz because the dosage of Neurontin had ceased to be effective in alleviating his symptoms. *See id.* ¶ 35. Two weeks later, Dr. Ruiz evaluated the plaintiff and increased the daily dosage of Neurontin. *See id.* ¶¶ 36-38.

At some point in October 2015, the plaintiff submitted a written request to be seen by Dr. Ruiz because the dosage of Neurontin had ceased to be effective in alleviating his symptoms. *See id.* ¶ 39. In November 2015, Dr. Ruiz evaluated the plaintiff and increased the daily dosage of Neurontin. *See id.* at 12 ¶¶ 40-42.

---

[1] Neurontin: trade name for gabapentin. Indications: partial seizures, postherpetic neuralgia, restless legs syndrome, neuropathic pain, and prevention of migraine headaches, bipolar disorder, anxiety, and diabetic peripheral neuropathy. *Farlex Drug Guide*. (2015). Retrieved October 31, 2018 from https://medical-dictionary.thefreedictionary.com/Neurontin.

On March 21, 2016, the plaintiff sent a written request to the medical department seeking an appointment with Dr. Ruiz because the dosage of Neurontin had ceased to be effective in alleviating his symptoms. *See id.* ¶ 43. On April 6, 2016, the plaintiff sent a follow up request to be seen by Dr. Ruiz. *See id.* ¶ 44. On April 12, 2016, a medical provider indicated that the plaintiff would be seen by Dr. Ruiz soon. *See id.* ¶ 45. On May 12, 2016, the plaintiff submitted a request for a health services review seeking treatment for his painful skin condition. *See id.* ¶ 46.

On May 19, 2016, the plaintiff was seen by a physician other than Dr. Ruiz because Dr. Ruiz was on vacation. *See id.* at 13 ¶ 53. The physician did not treat the plaintiff but stated that Dr. Ruiz would evaluate the plaintiff when he returned from vacation. *See id.*

In June 2016, Dr. Ruiz evaluated the plaintiff. *See id.* ¶ 54. During the appointment, the plaintiff gave Dr. Ruiz a written request seeking a change in his oral medication from Neurontin to Lyrica and a written request seeking a pass for a single cell. *See id.* at 13-14 ¶ 55. The plaintiff sought a single cell pass because he believed that his medical symptoms might cause friction between himself and a cellmate and lead to an altercation during which he might re-injure his face. Dr. Ruiz evaluated the plaintiff, increased the daily dosage of Neurontin, and indicated that he would email Captain Harlow to request that Harlow place the plaintiff in a cell without a cellmate. *See id.* at 15 ¶¶ 56-57.

At some point in July 2016, the plaintiff spoke to Captain Harlow about his single cell pass. *See id.* ¶ 58. Captain Harlow indicated that he had not heard from Dr. Ruiz, but that he would follow-up with him. *See id.* The plaintiff subsequently learned that Dr. Ruiz had informed Captain Harlow that he did not require a single cell. *See id.* ¶ 59.

On March 30, 2017, the plaintiff met with a nurse named Mark because his skin was still itchy and the dosage of Neurontin was not alleviating his symptoms. *See id.* ¶ 60. Nurse Mark informed the plaintiff that he would be seen by Dr. Ruiz on April 3, 2017. *See id.*

On April 20, 2017, the plaintiff sent a written request to the medical department seeking an appointment with Dr. Ruiz as soon as possible because his symptoms had been acting up. *See id.* at 16 ¶ 61. In response, the plaintiff received a note indicating that he would be seen in May 2017. *See id.* ¶ 62. On May 4, 2017, the plaintiff submitted a request for health services review seeking treatment for his painful skin condition because the dosage of Neurontin had become ineffective. *See id.* ¶ 65. On May 9, 2017, Nurse Ventrella informed the plaintiff that he must wait his turn to be seen by Dr. Ruiz. *See id.* ¶ 66.

On May 17, 2017 at approximately 11:30 p.m., the plaintiff began to scream because the skin on his face, head, neck, and upper chest burned as if those areas had been sprayed with mace. *See id.* at 17 ¶ 68. The plaintiff immediately noticed that the fan in his cell had been turned off and the cell vent had been covered with cardboard. *See id.* When the plaintiff ripped the covering from the vent, the plaintiff's cellmate threatened to "bash [his] face." *See id.* The plaintiff took his cellmate's threats seriously and assaulted his cellmate "with a razor blade and rope." *See id.* Prison officials sprayed the plaintiff with mace, removed him from the cell, and escorted him to a cell in the restrictive housing unit. *See id.* at 17-18 ¶ 68.

On May 20, 2017, the plaintiff submitted a written request to be seen by Dr. Ruiz for his painful skin condition. *See id.* at 18 ¶ 69. On May 30, 2017, Nurse John Doe arrived at the plaintiff's cell and questioned him about his request for medical treatment. *See id.* ¶ 70. The plaintiff indicated that he needed to be seen by Dr. Ruiz for his painful and itchy skin condition.

*See id.* Nurse John Doe stated that he would schedule an appointment for him with Dr. Ruiz for the following day. *See id.* Dr. Ruiz did not see or evaluate the plaintiff on May 31, 2017. *See id.* ¶ 71. On June 1, 2017, prison officials at Cheshire transferred the plaintiff to Northern Correctional Institution ("Northern"). *See id.* ¶ 73.

On August 1, 2017, the plaintiff wrote to Director Maurer about the failure of medical providers to dispose of his requests for health services review in a proper manner. Director Maurer did not respond to the plaintiff's letter.

### C.    Discussion

The plaintiff claims that all the defendants were deliberately indifferent to his serious medical condition. He asserts that Nurses Jane Doe, John Doe, and Jane Ventrella delayed his access to medical appointments with Dr. Ruiz and that Dr. Ruiz failed to effectively treat his neurological/skin condition. The plaintiff also alleges that Dr. Ruiz was deliberately indifferent to his health or safety by failing to follow through on his request that he be placed on single-cell status. The court construes the plaintiff's allegations as asserting Eighth Amendment claims of deliberate indifference to medical needs and deliberate indifference to health and/or safety.

Deliberate indifference by prison officials to a prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *See Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment). There is a subjective and an objective component to the deliberate indifference standard. To state a claim for deliberate indifference to a serious medical or mental health need, a plaintiff must meet a two-pronged test. Under the first prong, a plaintiff must demonstrate that

10

his or her medical or mental health need was "'sufficiently serious.'" *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quotation marks omitted).

Subjectively, the defendant must have been aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions. *See Spavone,* 719 F.3d at 138 *(citing Salahuddin*, 467 F.3d at 280). Mere negligent conduct does constitute deliberate indifference. *See Salahuddin*, 467 F.3d at 280 ("[R]ecklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent."); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir. 2003) (medical malpractice alone does not amount to deliberate indifference).

To state a claim of deliberate indifference to health or safety due to an unconstitutional condition or unconstitutional conditions of confinement, an inmate must demonstrate both an objective and a subjective element. To meet the objective element, the inmate must allege that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[] necessity[y]" or a "substantial risk of serious harm" to his health. *Farmer v Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted). The Supreme Court has identified the following basic human needs of an inmate: food, clothing, shelter, medical care, warmth, safety, sanitary living conditions and exercise. *See Wilson v.*

*Seiter*, 501 U.S. 294, 304 (1991); *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *Rhodes,* 452 U.S.at 348.

To meet the subjective element, the inmate must allege that the defendant prison officials possessed culpable intent, that is, the officials knew that he or she faced a substantial risk to his or her health or safety and disregarded that risk by failing to take corrective action. *See Farmer, 511 U.S.* at 834, 837. The subjective element requires that the inmate allege that prison officials acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 389-40).

### 1. Director Kathleen Maurer

Although the allegations in the Second Amended Complaint suggest that the plaintiff sent a letter on August 1, 2017 to Director Maurer regarding medical treatment issues at Cheshire, a copy of the letter, which is attached to the Second Amended Complaint, reflects that the plaintiff only included complaints regarding medical treatment issues at Northern that had occurred after his transfer to Northern on June 1, 2017. *See* Second Am. Compl., at 19 ¶¶ 74-76 & Exs. at 42. Because the plaintiff has not alleged that he made Director Maurer aware of the medical treatment that he did or did not receive at Cheshire prior to June 1, 2017, he has not stated that she was deliberately indifferent to his serious medical needs with regard to his treatment during his confinement at Cheshire. The Eighth Amendment claim pertaining to the plaintiff's treatment or lack of treatment at Cheshire as asserted against Director Maurer is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

There are no allegations in the Second Amended Complaint regarding the plaintiff's treatment at Northern. If the plaintiff seeks to pursue allegations against Director Maurer

regarding his medical treatment or lack of medical treatment at Northern, he may file a separate action.

## 2. Nurse Jane Doe

In the body of the complaint, the plaintiff refers to defendant Nurse Jane Doe as Nurse Jane Doe Administrative Remedy Health Coordinator. *See* Second Am. Compl. at 12-13 ¶¶ 48-51. The plaintiff states that he submitted a request for health services review on May 12, 2016 seeking treatment for the condition that caused itchiness and pain to his face, head, neck, and upper chest. On July 18, 2016, in response to the request for health services review, Nurse Jane Doe Administrative Remedy Health Coordinator indicated that the plaintiff had been seen by a physician on May 19, 2016. The plaintiff complains that Nurse Jane Doe failed to respond to his request for health services review in a timely manner.

The Second Circuit has held that neither state directives nor "state statutes ... create federally protected due process entitlements to specific state-mandated procedures." *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003). Thus, allegations that a prison official violated the procedures set forth in a state's administrative remedy program that is applicable to prisoner grievances do not state a claim of a violation of an inmate's constitutional rights. *See Swift v. Tweddell,* 582 F. Supp. 2d 437, 445–46 (W.D.N.Y. 2008) ("It is well established [] that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim.") (collecting cases). In addition, "prisoners do not have a due process right to a thorough investigation of grievances." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010) (citing *Torres v.*

*Mazzuca*, 246 F. Supp. 2d 334, 341-42 (S.D.N.Y. 2003) ("The corrections officers' failure to properly address [plaintiff's] grievances by conducting a thorough investigation to his satisfaction does not create a cause of action for denial of due process because [plaintiff] was not deprived of a protected liberty interest.")).

To the extent that the plaintiff claims that Nurse Jane Doe failed to properly process his request for a health services review in compliance with Department of Correction Administrative Directives, such a claim does not rise to the level of a violation under the Fourteenth Amendment. *See Brown v. Graham*, 470 F. App'x 11, 13 (2d Cir. 2012) ("Brown's argument that he has a federally-protected liberty interest in the state's compliance with its own prison grievance procedures is meritless.") The Fourteenth Amendment due process claim against Nurse Jane Doe is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

To the extent that the plaintiff also claims that Nurse Jane Doe violated his Eighth Amendment rights, he concedes that he was seen by a physician on May 19, 2016, and that he was also seen by Dr. Ruiz at the end of June 2016. He does not assert that he otherwise contacted Nurse Jane Doe or sought further medical treatment from her after he submitted his request for a health services review on May 12, 2016. Thus, the plaintiff has not alleged that Nurse Jane Doe was deliberately indifferent to his medical needs. The Eighth Amendment claim against Nurse Jane Doe is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 3. Nurse John Doe

The plaintiff alleges that on May 30, 2017, Nurse John Doe came to see him in the segregation unit in response to his request to see Dr. Ruiz. Nurse John Doe informed the plaintiff that he would be placed on the list to be seen by Dr. Ruiz the following day. The

plaintiff claims that Dr. Ruiz did not see him on May 31, 2017, and that on June 1, 2017, prison officials at Cheshire transferred him to Northern.

The court concludes that the plaintiff has not alleged that Nurse John Doe was deliberately indifferent to his medical needs. Rather in response to the plaintiff's request to be seen by someone in the medical department regarding his itchy and painful condition, Nurse John Doe met with the plaintiff on May 30, 2017, noted the plaintiff's complaints regarding an itchy scalp and that the plaintiff believed that the prescription for Neurontin was no longer providing him with relief, and scheduled the plaintiff to be seen by a physician on May 31, 2017 to discuss whether a prescription for Lyrica would be effective in treating the plaintiff's condition. *See* Second Am. Compl. at 18 ¶ 70 & Exs. at 40-41. There are no allegations that Nurse John Doe was responsible for the fact that a physician at Cheshire did not examine the plaintiff on May 31, 2017, prior his transfer to Northern on June 1, 2017. Nor does the plaintiff allege that he submitted any further complaints to Nurse John Doe prior to his transfer to Northern on June 1, 2017. Because the plaintiff has not alleged that Nurse John Doe was deliberately indifferent to his painful and itchy medical condition during his confinement at Cheshire, the Eighth Amendment claim against Nurse John Doe is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 4. Dr. Ricardo Ruiz

The plaintiff alleges that from 2012 through June 2016, Dr. Ruiz treated his symptoms of painful tingling, itching, and burning skin with various creams/ointments and oral medications. At some point in early 2014, after taking an oral medication for nine months, the plaintiff reported to Dr. Ruiz that the medication had not alleviated his symptoms. At that time, Dr. Ruiz

could not describe or definitively diagnose the cause of the plaintiff's symptoms. The plaintiff

requested that Dr. Ruiz refer him to a dermatologist or a neurologist. Instead of treating the

plaintiff's painful, itchy skin condition, Dr. Ruiz referred the plaintiff for a blood test to assess

the condition of his liver. In February 2015, the plaintiff informed Dr. Ruiz that he believed that

the painful tingling, itching, and burning sensations that he continued to experience all over his

head, face, neck, and upper chest were manifestations of a neurological disorder that had arisen

in connection with the surgical procedure that he underwent in 2009 to repair injuries to his face.

The plaintiff requested that he be started on an oral medication called Neurontin. In response to

the request, Dr. Ruiz prescribed Neurontin to treat the plaintiff's skin condition. The medication

alleviated the plaintiff's symptoms for several months. When the plaintiff complained that the

prescribed daily dosage of Neurontin was not alleviating his symptoms, Dr. Ruiz increased the

daily dosage of Neurontin. In June 2016, the plaintiff conceded that the prescribed daily dosage

of Neurontin had alleviated his symptoms, but only for several months at a time. The plaintiff

informed Dr. Ruiz that he would prefer to be evaluated by a specialist at UCONN regarding the

cause of his symptoms rather than to continue taking higher doses of Neurontin. Dr. Ruiz

increased the daily dosage of Neurontin and chose not to refer the plaintiff to UCONN. The

plaintiff alleges that he did not see Dr. Ruiz again prior to his transfer to Northern on June 1,

2017.

Although it is a close question, the court concludes that the plaintiff has alleged a

plausible claim that Dr. Ruiz was deliberately indifferent to his painful and itchy skin condition

from some point in early 2014 until February 2015. When the plaintiff's allegations are taken as

true and reasonable inferences drawn in his favor, Dr. Ruiz during that period did not take

16

seriously plaintiff's complaints about his skin condition. With regard to the time period before 2014, however, the plaintiff has not alleged that Dr. Ruiz ignored his symptoms. Rather, he prescribed various ointments and an oral medication that he thought would alleviate the plaintiff's symptoms. With regard to the time period from February 2015 to June 2016, the plaintiff concedes that in mid-February 2015, Dr. Ruiz prescribed an oral medication, Neurontin, that did alleviate his symptoms for a period of time and that when Dr. Ruiz subsequently learned that a particular dosage of Neurontin had ceased to be effective in treating his symptoms, Dr. Ruiz increased the daily dosage of Neurontin. Thus, the plaintiff has not alleged that Dr. Ruiz disregarded or failed to treat his painful and itchy skin condition during the period from February 2015 through June 2016, when he last treated the plaintiff.

The fact that the plaintiff would have preferred to have been referred to a dermatologist or neurologist does not state a claim of deliberate indifference, but rather a claim of a disagreement with treatment. *See Bolden v. Cty. of Sullivan*, 523 F. App'x 832, 833 (2d Cir. 2013) ("Indeed, we have held that a disagreement with the type of medical care provided is insufficient to state a constitutional claim; the essential test is one of medical necessity and not one simply of desirability.") (internal quotation marks and citations omitted); *Chance*, 143 F.3d at 703 ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Valdes v. Fischer*, No. 08-CV-749 LEK/DRH, 2010 WL 5638611, at *7 (N.D.N.Y. Dec. 7, 2010) ("Any complaints Valdes had about the whether he should be referred to a specialist or receive additional x-rays of his mouth constitute no more than a disagreement in his treatment. Such disagreements, without more, are insufficient to state an Eighth Amendment violation.") (citation omitted), *report and*

*recommendation adopted*, No. 9:08-CV-0749 LEK/DHR, 2011 WL 239808 (N.D.N.Y. Jan. 24, 2011). The court concludes allegations against Dr. Ruiz regarding his treatment of the plaintiff's itchy and painful skin condition pertaining to the period before 2014 and the period from February 2015 through June 2016 do not state a claim of deliberate indifference to medical needs. Thus, that Eighth Amendment claim is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

The plaintiff includes an additional allegation against Dr. Ruiz regarding his request for a single cell. The plaintiff claims that in June 2016, he sent a written request to Dr. Ruiz regarding his need to be in a cell without a cellmate because his medical symptoms might cause friction between himself and a cellmate and lead to an altercation during which he might re-injure the left side of his face. *See* Second Am. Compl. at 13-14 ¶ 55 & Exs. at 28. Dr. Ruiz allegedly told the plaintiff that he would contact Captain Harlow would request that Harlow place the plaintiff in a single cell. *See id.* at 15 ¶ 57. In July 2016, Captain Harlow informed the plaintiff that Dr. Ruiz had indicated that he did not require a single cell. *See id.* ¶ 59.

The fact that Dr. Ruiz may have changed his mind about whether the plaintiff required a single cell due to his medical condition does not state a claim of deliberate indifference to health or safety. The plaintiff's allegation that he could have been involved in a future altercation with a cellmate and that he might suffer new injuries is speculative. The plaintiff does not allege that he submitted any follow-up requests for single-cell status to Dr. Ruiz or that he suffered any further injuries to his face or other part of his body at Cheshire after June 2016.[2] The court concludes that the allegations regarding the plaintiff's need for a single cell and Dr. Ruiz's

---

[2] The plaintiff alleges that he was involved in an altercation with his cellmate in May 2017, almost a year after he submitted his request for single-cell status to Dr. Ruiz, but the plaintiff did not suffer any new injuries. *See id.* at 17-18 ¶ 68.

decision to change his mind about recommending that the plaintiff be placed on single-cell status at Cheshire fail to state a claim of deliberate indifference to the plaintiff's health or safety. The Eighth Amendment deliberate indifference to health and/or safety claim against Dr. Ruiz is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 5. Nurse Jane Ventrella

The plaintiff states that he submitted a request for health services review on May 4, 2017 seeking treatment from Dr. Ruiz for the condition that caused pain to his face and indicating that because the dosage of Neurontin that Dr. Ruiz had prescribed was no longer effective. On May 9, 2017, in response to the request for health services review, Nurse Ventrella informed the plaintiff that he must wait his turn to be treated by Dr. Ruiz. The plaintiff claims that Nurse Ventrella made no effort to schedule or facilitate the scheduling of an appointment in response to his allegations that he suffered from a painful medical condition and that the medication that Dr. Ruiz had prescribed was no longer effective in treating his symptoms. On May 30, 2017, a nurse evaluated the plaintiff. The court concludes that the plaintiff has stated a plausible claim that Nurse Ventrella was deliberately indifferent to his painful medical condition during the time period from May 4, 2017 to May 29, 2017.

### Conclusion

**(1)** The Motion to Reopen and to File a Second Amended Complaint, [**ECF No. 27**], is **GRANTED** to the extent that it seeks to reopen the case and to the extent that it seeks to file a second amended complaint to pursue only the claims against Dr. Ruiz, Nurse Ventrella, Nurse Jane Doe, Nurse John Doe, and Director Maurer regarding medical treatment or lack of medical treatment during his confinement at Cheshire from late 2012 to May 31, 2017. **The Clerk is**

directed to docket pages 3 to 45 of the motion to reopen and to file amended complaint, [ECF No. 27], as the Second Amended Complaint. The Motion to Amend, [ECF No. 28], the prayer for relief in the Second Amended Complaint, is **DENIED**.

(2)     The following allegations in the Second Amended Complaint are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1):  the Eighth Amendment claims of deliberate indifference to medical needs against Nurse John Doe, the Eighth Amendment claim of deliberate indifference to medical needs against Nurse Jane Doe, the Fourteenth Amendment claim that Nurse Jane Doe failed to properly process the plaintiff's health services, the Eighth Amendment claim of deliberate indifference to medical needs against Director Kathleen Maurer pertaining to her treatment of the plaintiff at Cheshire,  the Eighth Amendment deliberate indifference to medical needs claims against Dr. Ricardo Ruiz pertaining to the time period at Cheshire before 2014 and the time period at Cheshire from February 2015 through June 2016, and the Eighth Amendment  deliberate indifference to health and/or safety claim against Dr. Ruiz.   Thus, all claims against defendants Jane Doe, John Doe and Kathleen Maurer have been **DISMISSED**.  If the plaintiff seeks to pursue allegations against Director Maurer regarding his medical treatment or lack of medical treatment at Northern, he may file a separate action.

The Eighth Amendment claim of deliberate indifference to the plaintiff's painful and itchy skin condition from some point in early 2014 until February 2015 will proceed against Dr. Ruiz in his individual and official capacities and the Eighth Amendment claim of deliberate indifference to the plaintiff's painful and itchy skin condition from May 4, 2017 to May 29, 2017 will proceed against Nurse Jane Ventrella in her individual and official capacities.

20

**(3)** **Within twenty-one (21) days of this Order**, the Clerk shall prepare a summons form and send an official capacity service packet to the U.S. Marshal's Service. The U.S. Marshals Service shall serve the summons, a copy of the complaint and this order on defendants Ruiz and Ventrella in their official capacities by delivering the necessary documents in person to the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141.

**(4)** **Within twenty-one (21) days of this Order**, the Clerk shall ascertain from the Department of Correction Office of Legal Affairs the current work addresses for Nurse Jane Ventrella and Dr. Ricardo Ruiz and mail a copy of the Second Amended Complaint, this order and a waiver of service of process request packet to each defendant in his or her individual capacity at his or her current work address. On the thirty-fifth (35th) day after mailing, the Clerk shall report to the court on the status of each request. If any defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

**(5)** Defendants Ruiz and Ventrella shall file their response to the Second Amended Complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If the defendants choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

**(6)** Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within six months (180 days) from the date of this order. Discovery requests need not be filed with the court.

**(7)** All motions for summary judgment shall be filed within seven months (210 days) from the date of this order.

**(8)** **The Pro Se Prisoner Litigation Office shall** send a courtesy copy of the second amended complaint and this order to the Connecticut Attorney General and the Department of Correction Legal Affairs Unit.

SO ORDERED at Hartford, Connecticut this 6th day of November, 2018.

_____/s/_____
Michael P. Shea
United States District Judge